# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| EVANS DEWAYNE SCRUGGS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CIVIL ACTION NO. 14-339-CG-B |
| ) | |
| BERG SPIRAL PIPE CORP., ) | |
| ) | |
| Defendant. ) | |

## ORDER

Evans Dewayne Scruggs ("Plaintiff"), an African American who worked as a Support Operator and Grinder for Berg Spiral Pipe Corp. ("Defendant"), alleges Defendant unlawfully terminated his employment because of a perceived disability and his race. (Doc. 1, pp. 3 – 7). Consequently, Plaintiff filed this lawsuit asserting claims under the Americans with Disabilities Act of 1990, as amended 42 U.S.C. §§ 12101-12117 ("ADA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e – 2000e17 ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981"). (Doc. 1, pp. 5 – 8). This matter is now before the Court on Defendant's Motion for Summary Judgment (Doc. 26) together with supporting materials (Docs. 27, 28), Plaintiff's Response in Opposition (Docs. 30, 31), and Defendant's Reply. (Doc. 32). After careful consideration and for the reasons set forth herein, the motion is due to be GRANTED IN PART and DENIED IN PART.

## STANDARD OF REVIEW

The court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(c) governs procedures and provides that a party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion. This includes "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004).

The substantive law of the plaintiff's cause of action determines which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If a non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. In reviewing whether a non-moving party has met its burden, the Court must stop short of weighing the evidence and determining credibility. Instead, the Court must draw all justifiable inferences in favor of

2

the non-moving party. Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 – 99 (11th Cir. 1992) (internal citations and quotations omitted). Thus the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251–52.

## FACTS[1]

Plaintiff started working for Defendant on March 28, 2012 as a temporary employee. (Doc. 27, p. 4). Elwood Staffing, a skilled trades staffing company, helped place Plaintiff at Defendant's facility. (Doc. 27, p. 2). Defendant considers temporary employees for permanent openings when positions become available, if the temporary employee passes the Test for Adult Basic Education, and completes a criminal background investigation, drug screen, and medical examination. (Doc. 27, pp. 3 – 5).

In January 2013, a permanent opening for a grinder position became available. (Doc. 27, p. 4). Defendant considered Plaintiff for the opening. Grinders must operate a handheld grinder and other equipment listed in the job description. (Doc. 27, p. 4; Doc. 27-1, pp. 21-22). Grinders generally tack welding tabs on to pipes, or cut them off, depending on the assignment. (Doc. 27, p. 4). Grinders also roll pipe down the production line, which can require exerting 40 pounds of torque. (Doc. 27, p. 4).

---

[1] At the summary judgment stage, the facts are taken in the light most favorable to the non-movant. Tipton, 965 F.2d at 998–99. The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

As required for the permanent position, Plaintiff passed the Test for Adult Basic Education on January 17, 2013. (Doc. 27, p. 4). On January 28, 2013, Defendant sent Plaintiff an offer letter for the permanent grinder position. (Doc. 27-1, pp. 18 – 19). The offer letter described the position, pay, and benefits associated with the job. (Doc. 27-1, p. 18). The letter also stated:

> If you are agreeable to our offer you must pass, at Berg's expense, a pre-employment physical examination and drug test prior to starting work. The drug screen must be conducted within 48 hours of receipt of this letter. This employment offer will be withdrawn if the drug screen is not conducted within that 48 hour time period.

(Doc. 27-1, p. 18). The letter continued:

> Your employment is contingent on education verification (high school graduation or GED is required), our receipt of a favorable background investigation and pre-employment physical exam, results of a negative drug test, and I-9 verification of authorization to work in the U.S.

(Doc. 27-1, p. 18). The letter concluded by saying, "Your start date is scheduled for as soon as administratively possible." (Doc. 27-1, p. 19).

Plaintiff completed the drug screen and physical examination on January 29, 2013, one day after receiving the letter. (Doc. 27, p. 5). The drug screen results returned negative, meaning Plaintiff did not test positive for any of the drugs screened in the test. (Doc. 30, p. 5). Dr. Terry W. Taylor conducted Plaintiff's physical examination. (Doc. 27, p. 5; Doc. 31-5, p. 2). During the physical examination, Dr. Taylor learned that Plaintiff previously had back surgery. (Doc. 30, p. 7). Plaintiff told Dr. Taylor he did not have any medical restrictions as a result of his back surgery, but he informed Dr.

4

Taylor that he had prescriptions for Lortab and Skelaxin.[2] (Doc. 30, p. 8; Doc. 31-4, p. 3). Plaintiff's pre-placement medical report stated he "is not currently taking Lortab or Skelaxin." (Doc. 31-4, p. 3). At the end of the exam, Dr. Taylor prepared a report for Defendant, which under "accommodation required" stated "[n]o safety sensitive work," and "[n]o lifting over 40 lbs." (Doc. 27-1, p. 24).

Defendant received the report from Dr. Taylor on February 13, 2013. (Doc. 27, p. 5). Upon receiving the physical examination report, Jim Key, Human Resources Manager for Defendant, e-mailed Dr. Taylor to ask him to elaborate on the note in the report regarding "no safety sensitive work." (Doc. 27-1, p. 5; Doc. 31-6; Doc. 31-7, pp. 2 – 3). Dr. Taylor replied and stated Plaintiff had received prescriptions for narcotic pain medication and muscle relaxers, and such medications "cause a safety concern." (Doc. 31-7, p. 2). Dr. Taylor explained safety sensitive work includes

> climbing to unprotected heights, operating dangerous equipment or machinery, working where one could fall into water and drown. It would also include responsibility of operation of monitors where attention to detail could put others in danger such as a control room operator that monitors chemical operations. DOT and Coast Guard consider these medications disqualifying for individuals that need a license such as truck drivers, boat captains or engineers.

(Doc. 31-7, p. 2). Mr. Key then asked via e-mail whether Dr. Taylor could confirm if Plaintiff currently used the prescription drugs. (Doc. 31-7, p. 2). Dr.

---

[2] Lortab is a narcotic pain reliever used to treat moderately severe pain. Skelaxin is a muscle relaxant used to relax muscles and relieve musculoskeletal pain. (Doc. 27-3).

5

Taylor stated an orthopedist had prescribed them to Plaintiff in the recent past, Plaintiff tested negative on the drug screen, and the drug screen did not test for muscle relaxers. (Doc. 31-7, p. 2). Dr. Taylor offered to change his recommendation to "no safety sensitive work while taking narcotics and muscle relaxers." (Doc. 31-7, p. 2).

After receiving this information from Dr. Taylor, Mr. Key and Scott Schuler met with Plaintiff on February 15, 2013. (Doc. 27-1, p. 6). Mr. Key told Plaintiff he was withdrawing the offer of employment because pushing pipe may be a problem for Plaintiff and he posed a high risk to the company. (Doc. 30, p. 8). Mr. Key did not ask Plaintiff about his current prescription drug use, nor did Mr. Key discuss with Plaintiff whether he would refrain from using substances that would impair his ability to work safely. (Doc. 30, p. 8). Mr. Key then contacted Elwood Staffing through e-mail, and stated Defendant could not offer Plaintiff employment because "he has back limitations, we cannot risk him harming his health in his current assignment and therefore his assignment at Berg must be ended." (Doc. 31-8, p. 2).

Plaintiff timely submitted a charge with the Equal Employment Opportunity Commission ("EEOC") on March 4, 2013, alleging discrimination based on race and disability. (Doc. 31-1, pp. 2 – 3). On March 29, 2013, Defendant sent Plaintiff a second offer of employment for the same position and pay. (Doc. 31-10). On August 2, 2013, Defendant responded to Plaintiff's EEOC charge. (Doc 30, p. 10). In its response, Defendant stated it "made an

unconditional offer of reinstatement on March 29, 2013, which [Plaintiff] declined." (Doc. 31-2, p. 2). Defendant also stated in its response that it decided to bring Plaintiff back to work if he would agree to adhere to the drug-free workplace policy and not use substances that may impair his ability to work safely. (Doc. 31-2, p. 5).[3] Defendant asserted it terminated Plaintiff because of its concern over "whether [Plaintiff] could perform either job if he's taking muscle relaxers because of the potential for temporary mental impairment as a side effect to the drug. It is potentially unsafe." (Doc. 31-2, p. 4). Defendant further stated it decided to make Plaintiff a second permanent job offer after receiving the additional background information about Plaintiff in the EEOC charge. (Doc. 31-2, p. 4).[4]

Plaintiff also alleged racial discrimination in his EEOC charge. (Doc. 31-1, p. 3). Plaintiff observed Defendant hire a white employee, Phillip Wells,

---

[3] The policy is not mentioned in Defendant's second offer letter (Doc. 31-10), but it is attached as an exhibit to Defendant's motion. (Doc. 27-1, pp. 26 – 29). The Drug-Free Workplace Compliance policy states in relevant part:

> Although we do not prohibit proper use of prescription medication, we do prohibit the abuse of such substances. Employees must consult with their doctors about the effect of prescribed medications on their ability to work in a safe manner, and promptly disclose any restrictions to the Safety Supervisor. If the Company has reason to believe that the medication is affecting job performance, it may temporarily reassign the employee or take other appropriate action.

(Doc. 27-1, p. 26). No one alleges Plaintiff abused his prescription drugs.

[4] In his response to the motion for summary judgment, Plaintiff states this is disingenuous, because there is no reference to medication or new information in his EEOC charge. (Doc. 30, p. 15, n. 2).

7

to work as a grinder after Defendant withdrew its job offer to Plaintiff. (Doc. 30, p. 9). Plaintiff also stated in his EEOC charge that Defendant "failed to make other African American employees permanent employees because of their race." (Doc. 31-1, p. 3). In response, Defendant notes that since 2009, it "has hired 33 African Americans who were working as temporary contract employees into permanent positions." (Doc. 31-2, pp. 5 – 6). Defendant further notes nine other employees who reported taking prescription medication were not terminated, including one African American. (Doc. 32, p. 3). The EEOC issued its dismissal and notice of rights letter to Plaintiff on May 1, 2014, and Plaintiff timely filed this lawsuit. (Doc. 1-2, p. 1).

Defendant filed its motion for summary judgment, arguing Plaintiff cannot establish a *prima facie* discrimination case or rebut Defendant's non-discriminatory reasons for its actions. (Doc. 27, p. 1). Defendant argues it "terminated Plaintiff's temporary assignment and withdrew its conditional offer of employment because it was concerned that his previous use of prescription muscle relaxers, which do not show up on a drug screen, could pose a potential danger to himself and to others in the workplace." (Doc. 27, pp. 1 – 2).

In response, Plaintiff asserts Defendant perceived him as disabled, and unlawfully terminated his employment. (Doc. 30, p. 4). Plaintiff also maintains Defendant discriminated against him because of his race. (Doc. 30, p. 21). Plaintiff's disability discrimination claim and racial discrimination

8

claim are analyzed separately below.

## ANALYSIS

**1. ADA Discrimination Claim**

The ADA prohibits discrimination against a "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Accordingly, a "qualified individual with a disability" means a person who is actually disabled, recorded as disabled, or "regarded as" disabled. Sutton v. United Air Lines, Inc., 527 U.S. 471, 478 (1999) superseded by statute, U.S. Pub. L. 110-325 (January 1, 2009).

Plaintiff contends Defendant regarded him as disabled, and unlawfully terminated him because of his perceived disability. Owusu-Ansah v. Coca-Cola Co., 715 F.3d 1306, 1310 (11th Cir. 2013) cert. denied, 134 S. Ct. 655 (2013) (concluding 42 U.S.C. § 12112(d)(4)(A) protects employees who are not disabled); Williams v. Motorola, Inc., 303 F.3d 1284, 1290 (11th Cir. 2002) (holding a plaintiff may maintain a claim under the ADA of being perceived as disabled without proof of actually being disabled). As the Eleventh Circuit has elaborated, "[u]nder the 'regarded as' prong, a person is 'disabled' if her employer perceives her as having an ADA-qualifying disability, even if there

is no factual basis for that perception." Carruthers v. BSA Advertising, Inc., 357 F.3d 1213, 1216 (11th Cir. 2004) (citation omitted). This type of "regarded as" claim is analyzed under the McDonnell Douglas[5] burden-shifting framework. D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1226 (11th Cir. 2005); 42 U.S.C. § 12102(3).

The McDonnell Douglas burden-shifting framework requires Plaintiff to first establish a *prima facie* discrimination case. Thus Plaintiff must show (1) a disability (whether real or perceived), (2) that he was otherwise qualified to perform the essential functions of the job, and (3) he was discriminated against based upon the (real or perceived) disability. Gordon v. E.L. Hamm & Assoc., Inc., 100 F.3d 907, 910 (11th Cir. 1996); accord D'Angelo, 422 F.3d at 1226 (citations omitted).[6] After a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action. As Defendant notes, an employer may inquire into whether an employee suffers from a disability so long as such examination is limited to "job-related

---

[5] See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).
[6] In its reply, Defendant contends "Plaintiff has presented no evidence that he was replaced by a person who was not disabled or identified any employee or any comparator evidence showing that he was treated less favorably than similarly situated persons outside his protected classification." (Doc. 32, pp. 5-6). Defendant is confusing the elements of a *prima facie* racial discrimination claim with the elements of a *prima facie* "regarded as" disabled discrimination claim. See Snider v. U.S. Steel-Fairfield Works Med. Dep't, 25 F. Supp. 3d 1361, 1366 (N.D. Ala. 2014) aff'd, 591 F. App'x 908 (11th Cir. 2015) (discussing how ADA claims use the same burden shifting analysis as Title VII claims, but listing different *prima facie* elements for ADA claim).

10

functions" and "consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A); 29 C.F.R. § 1630.14(c); see also Owusu-Ansah, 715 F.3d at 1311 – 12 (analyzing the ADA phrase "job-related and consistent with business necessity"). Finally, the burden shifts back to the plaintiff to produce sufficient evidence to allow a fact-finder to conclude that the employer's reasons were not the real reasons for the adverse employment action. Wascura v. City of S. Miami, 257 F.3d 1238, 1242–43 (11th Cir. 2001).

Here, Plaintiff argues Defendant fired him because of a perceived disability: his previous back surgery and alleged back limitations. (Doc. 30, p. 4). Plaintiff showed he was otherwise qualified to perform the essential functions of the job, and he had been working for Defendant for several months before being offered a permanent position. Defendant did not retract its offer of employment until it learned about Plaintiff's previous back surgery. Based on the record, Defendant may have regarded Plaintiff as disabled, and unlawfully discriminated against him because of that perceived disability. Plaintiff has established a *prima facie* case of discrimination.

The burden shifts to Defendant to show a legitimate, nondiscriminatory reason for terminating Plaintiff's position with the company. Defendant argues its decision "not to hire Plaintiff as a permanent employee and to terminate his temporary placement with the Company was based upon Plaintiff's recent history of use of prescription muscle relaxers, … [which] could impair his ability to work in a safety sensitive environment."

(Doc. 32, p. 2). Defendant therefore argues it had a reasonable objective concern that Plaintiff presented a safety risk. (Doc. 27, p. 14). This legitimate explanation is enough to shift the burden back to Plaintiff to show that this reasoning is a pretext.[7]

To rebut Defendant's proferred reason as a pretext, Plaintiff observes that when Mr. Key terminated his employment, he made statements only about Plaintiff's back, and not his prescription drug use. (Doc. 30, p. 15). Plaintiff further argues that the March 2013 job offer creates the inference that Defendant's decision to terminate him was not motivated by any safety concern because he had the same history of prescription medication then, and Defendant had not communicated with Plaintiff about that medication. (Doc. 30, p. 15). Plaintiff also argues that Defendant made no effort to ask him whether he was currently taking muscle relaxers, or whether he would be willing to stop taking his medication while working for Defendant. (Doc. 30, p. 16). Indeed, Defendant states that while Mr. Key did not "expressly

---

[7]   As legal prescription drug use increases, employers are faced with new challenges concerning workplace safety, employee health, and potential discrimination. In turn, more prescription drug-related cases are being litigated in court. See, e.g., Bates v. Dura Auto. Sys., Inc., 767 F.3d 566, 580 (6th Cir. 2014) (court finding drug-testing protocol pushes the boundaries of the EEOC's medical-examination and disability-inquiry definitions; remanding case to district court for jury trial); Connolly v. First Pers. Bank, 623 F. Supp. 2d 928, 932 (N.D. Ill. 2008) (denying motion to dismiss after employer fired employee for legal prescription drug use); see also Elisa Y. Lee, An American Way of Life: Prescription Drug Use in the Modern ADA Workplace, 45 Colum. J.L. & Soc. Probs. 303, 318 (2011) (noting the number of employees testing positive for prescription painkillers increased by more than 40% from 2005 to 2009).

reference Plaintiff's recent history of use of undetectable prescription drugs which could impact his safety, Mr. Key's statements express concerns about Plaintiff's back condition…." (Doc. 32, pp. 4 – 5). The Court finds Plaintiff successfully challenges Defendant's reason for terminating him as a pretext.

Additionally, it is not clear when Defendant developed its "reasonable objective concern" that Plaintiff presented a risk to himself and others in the workplace, nor is it obvious that Plaintiff could not safely perform the job functions described. (Doc. 27, p. 14). EEOC guidance explains that an employer generally may not "ask all employees what prescription medications they are taking" because such an inquiry is not job-related and consistent with business necessity, but notes that the questioning may be necessary for "employees in positions affecting public safety." EEOC, Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA) Part B.2 (July 27, 2000), available at http://www.eeoc.gov/policy/docs/guidance-inquiries.html. "Under these limited circumstances, an employer must be able to demonstrate that an employee's inability or impaired ability to perform essential functions will result in a direct threat." Id.

The record before the Court does not resolve many factual issues that remain, including what job functions Plaintiff could allegedly not perform, when and how Defendant developed its "reasonable objective concern" that Plaintiff presented a safety risk, and whether Defendant unlawfully

13

terminated Plaintiff because of his prior back surgery. After careful consideration, the Court finds Plaintiff has demonstrated there are genuine disputes of material facts concerning his ADA discrimination claim. As a result, there are allegations in this case that a fact-finder must decide, and Plaintiff's claim cannot be decided as a matter of law. Defendant's motion for summary judgment on Plaintiff's ADA discrimination claim is therefore DENIED.

**2. Racial Discrimination Claim**

Plaintiff claims Defendant unlawfully terminated his employment because of his race in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Title VII prohibits an employer from discriminating against a person based on race. 42 U.S.C. § 2000e–2(a)(1). Likewise, Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts. See, e.g., Johnson v. Railway Express Agency, 421 U.S. 454 (1975) (holding Section 1981 protects against racial discrimination in private employment).

The test for discrimination in suits under Section 1981 is the same as that used in Title VII discriminatory treatment cases. See Ferrill v. The Parker Group, Inc., 168 F.3d 468, 472 (11th Cir. 1999). The plaintiff must first establish a *prima facie* case of discrimination. This *prima facie* case can be established in any one of three ways: (1) by presenting direct evidence of discriminatory intent; (2) by presenting circumstantial evidence of

discriminatory intent through the McDonnell Douglas test; or (3) by demonstrating through statistics a pattern of discrimination. Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).

In this case, there is no direct evidence of racial discrimination. Nor does Plaintiff introduce statistics to show a pattern of discrimination. The Court must therefore analyze Plaintiff's claim based on circumstantial evidence pursuant to the burden-shifting rubric articulated in McDonnell Douglas.

To present a *prima facie* case of racial discrimination, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) his employer treated him less favorably than similarly situated individuals outside of his protected class. Smith v. Lockheed–Martin Corporation, 644 F.3d 1321, 1325 (11th Cir. 2011). With respect to the last element, "the individuals must be similarly situated in all relevant respects besides race, since different treatment of dissimilarly situated persons does not violate civil rights laws." Jackson v. BellSouth Telecommunications, 372 F.3d 1250, 1273–74 (11th Cir. 2004) (internal citations and quotation omitted). See also Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004) ("The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer.").

If the plaintiff is successful in proving a *prima facie* case, then a

presumption of discrimination is raised and the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for its employment action. Smith, 644 F.3d at 1324–25. If the defendant meets this burden, then the inquiry shifts back to the plaintiff, and he must prove by a preponderance of evidence that the defendant's reason is a mere pretext for unlawful discrimination. Id. at 1326–27 (citations omitted). "Thus, if a jury reasonably could infer from the evidence presented that the employer's legitimate justification is pretextual, the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination." Id. at 1326–27 (citation omitted).

Here, Plaintiff readily satisfies three of the four elements required for a *prima facie* case. First, Plaintiff is in a protected class due to his race, African American. Second, the parties do not dispute that he was otherwise qualified for the job. (Doc. 30, p. 20). Third, Plaintiff suffered an adverse action when Defendant rescinded its offer of employment.

The fourth element, however, is not satisfied, because Plaintiff fails to show how Defendant treated him less favorably than similarly situated individuals outside of his protected class. Plaintiff points only to the fact that nine other employees who reported taking prescription medication were not terminated, and just one of those nine was African American. (Doc. 30, p. 21; Doc. 32, p. 3). Plaintiff also asserts that Defendant replaced him with a white

employee. (Doc. 30, p. 21). This is the extent of Plaintiff's argument for his racial discrimination claim. Plaintiff does not, for example, explain what positions those nine other employees held, whether Defendant also regarded them as disabled, or whether they were prescribed the same or similar medications as him. Furthermore, no one claims that the white employee who replaced Plaintiff also had a perceived disability or used prescription medication. The Court therefore finds Plaintiff does not point to adequate comparators, which is needed to satisfy the fourth element of a *prima facie* racial discrimination claim. In the absence of evidence to reflect that Defendant treated similarly situated employees who are not members of Plaintiff's class more favorably, Plaintiff has failed to establish a *prima facie* case.

Even if Plaintiff had established a *prima facie* case, the Court finds that Defendant would still be entitled to summary judgment on this claim. Once a plaintiff establishes a *prima facie* case, the burden then shifts to the defendant, who must "proffer a legitimate, non-discriminatory reason for the adverse employment action. The employer's burden is exceedingly light." Hamilton v. Montgomery Cnty Bd. of Educ., 122 F. Supp. 2d 1273, 1280 (M.D. Ala. 2000) (quoting Meeks v. Computer Assoc. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994)) (internal quotations omitted). Defendant's argument and evidence shows that it decided to terminate Plaintiff because of his back surgery or prescription drug use. While Defendant's decision to terminate

Plaintiff for this reason may result in a claim under the ADA, it does not equate to racial discrimination under Title VII or Section 1981. This is a legitimate, nondiscriminatory reason to terminate Plaintiff's employment that is not driven by racial animus. Nor does Plaintiff successfully rebut Defendant's proffered reason as pretext. Plaintiff merely reiterates that nine other employees, eight of whom were white, were allowed to continue working for the company after disclosing their prescription drug use. (Doc. 30, p. 21). This is not enough to establish a claim of racial discrimination pursuant to McDonnell Douglas. Accordingly, Defendant's motion or summary judgment on this claim is due to be GRANTED.

## CONCLUSION

After a careful review of the record, the Court finds Plaintiff has demonstrated there are genuine disputes of material facts for his ADA claim. As a result, Plaintiff's disability discrimination claim cannot be decided as a matter of law. Accordingly, Defendant's Motion for Summary Judgment (Doc. 26) is **DENIED** as to Plaintiff's ADA claim (Count I). The Court further concludes there is no genuine issue as to any material fact for Plaintiff's race discrimination claim, and it can be determined as a matter of law. Defendant's Motion for Summary Judgment (Doc. 26) is therefore **GRANTED** as to that claim (Count II).

**DONE and ORDERED** this 22nd day of June, 2015.

/s/ Callie V. S. Granade
**UNITED STATES DISTRICT JUDGE**